**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| JERRY LAMB, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. AW-03-3128 |
| THE BOEING COMPANY, | * | |
| Defendant. | * | |

\* \* \* \* \*

**MEMORANDUM OPINION**

This action involves a Title VII suit brought by Jerry Lamb ("Lamb" or "Plaintiff") against his employer, The Boeing Company ("Boeing" or "Defendant"). Specifically, Plaintiff's Complaint contains the following counts: Count I — Discrimination; Count II — Intentional Infliction of Emotional Distress; Count III — Retaliation. Currently pending before the Court is Defendant's Motion for Summary Judgment [40], Defendant's Motion to Strike [53], Plaintiff's Motion for Court Ordered Mediation [55] and Plaintiff's Motion to Amend/Correct Complaint [56]. The Court has reviewed the entire record, as well as the pleadings with respect to the instant motions. No hearing is deemed necessary. *See* Local Rule 105.6 (D. Md. 2004). For the reasons stated below, the Court will grant Defendant's Motion for Summary Judgment.

**I.      FACTUAL & PROCEDURAL BACKGROUND**

The following facts are taken in the light most favorable to the non-movant. Lamb, an African American male, began working for the McDonnell Douglas Corporation ("McDonnell Douglas") in 1992. In 1996-97, McDonnell Douglas merged with Boeing, and Plaintiff became a Boeing employee. Plaintiff

1

sought other employment in 1997, but was rehired by Boeing in 1998 as a flight mechanic. In September 1999, Plaintiff was promoted to the position of Product Support Technical Specialist ("Tech Specialist"). Plaintiff's Tech Specialist position was located in the Data Center at Boeing's Patuxent River Naval Air Station ("Pax River") facility in Lexington Park, Maryland.

In September 1999, Plaintiff's on-site supervisor was Dexter Bordes ("Bordes") and his supervisor in Boeing's St. Louis facility was Rod Wisor ("Wisor"). Soon thereafter, Bordes transferred to St. Louis and John Destackleberg ("Destackleberg") became Plaintiff's on-site supervisor. In February 2002, Mark Milbrandt ("Milbrandt") assumed Destackleberg's position as on-site supervisor. When Plaintiff began working at the Data Center, Brian Diggle ("Diggle"), Plaintiff's co-worker and fellow Tech Specialist, was designated as the first shift, or day shift, "team leader." The team leader of the second or evening shift was David Dickson ("Dickson"). Team leader was not a supervisory position; the team leader had no authority to sign reviews or issue discipline, and was not granted any additional pay.

In August 2001, Plaintiff was, at his own request, temporarily moved from the day shift to the evening shift. Plaintiff alleges that, upon learning that Plaintiff was moving to the evening shift, Dickson, the evening shift team leader, told Plaintiff that he should call Dickson "Massah Dave."[1] Plaintiff was offended by this comment and reported the incident to Wisor and Human Resources Manager Michael Beeney ("Beeney"). In an e-mail message to Wisor, Plaintiff requested a written apology from Dickson concerning the offensive comment. Beeney spoke with both Dickson and Plaintiff about the incident and drafted an

---

[1] The Court notes that Defendant disputes this version of events. However, in considering Defendant's Motion for Summary Judgment, the Court will take the facts in the light most favorable to Plaintiff.

2

apology on behalf of Dickson, which Dickson subsequently signed. Plaintiff signed the document, signifying his acceptance of Dickson's apology. Plaintiff later became upset because the apology was not written on Boeing letterhead. However, Plaintiff concedes that, after the August 2001 incident and subsequent apology, Dickson made no further offensive comments and Plaintiff and Dickson maintained a professional relationship.

During his time at Boeing, Plaintiff had several conversations with Department Head/Skills Manager David Black ("Black") concerning Plaintiff's career prospects. Black, an African American male, is based out of St. Louis. Black works with Boeing employees to help them develop the necessary skills to enhance their opportunities for promotion and career growth within Boeing. Black repeatedly advised Plaintiff to transfer away from the Pax River facility, which was much smaller than the Boeing facilities in Philadelphia and St. Louis, and thus offered reduced opportunities for promotion and career development. Plaintiff alleges that Black advised Plaintiff to move from the Pax River facility in retaliation for Plaintiff's complaints regarding the August 2001 incident. Plaintiff concedes that Black gave him the advice to move away from the Pax River facility both before and after the August 2001 incident.

In February 2002, Plaintiff received a performance evaluation from his St. Louis supervisor, Destackleberg. Plaintiff believed that this performance review was both negative and based upon information provided to Destackleberg by Diggle. Plaintiff expressed these concerns to Destackleberg and Destackleberg altered Plaintiff's performance review accordingly.

Plaintiff generally alleges that Diggle and other co-workers were hostile to Plaintiff based upon Plaintiff's race. Specifically, Plaintiff complains that he was not informed of work-related matters, that his supervisors did not respond to his e-mails, or were "non-definitive" in their responses, that his input was

3

not sought out, and that Plaintiff was generally ignored. Plaintiff concedes that other Tech Specialists told Plaintiff that managers sometimes failed to respond to their e-mail inquiries.

Plaintiff also complains that minority employees were singled out for interviews during a security review. However, the evidence indicates that the review in question was in fact an EEO review of the Pax River facility, during which investigators from Boeing's EEO office spoke with employees in protected categories to ensure that Boeing was complying with its EEO policies.

Plaintiff further alleges that he was not allowed to create a Personal Development Plan ("PDP") in retaliation for engaging in protected activity. A PDP is an employee-initiated plan for that employee's professional development within Boeing. In May 2003, Plaintiff partially filled out a PDP, which he submitted to Milbrandt, his on-site supervisor. Milbrandt returned the PDP to Plaintiff, asking Plaintiff to complete the form and resubmit it to Milbrandt. Plaintiff did not resubmit the PDP form.

Plaintiff also brings several failure to promote claims, identifying ten positions in Boeing during the time period between October 2001 and April 2004 for which he applied and was rejected.[2] Specifically, Plaintiff cites to the following positions, which he was denied:

> **(1) October 2001 — Logistics Specialist[3]**
> Plaintiff was denied a promotion to the position of Logistics Specialist in October 2001.
>
> **(2) February 2002 — Quality Specialist**
> Plaintiff was denied a promotion to the position of Quality Specialist in

---

[2] The Court notes that, although Plaintiff's Complaint cites to a full 78 positions that Plaintiff was denied, Plaintiff concedes he was not qualified for all but ten of the positions for which he applied.

[3] The Court will not discuss the specifics of those job applications of Plaintiff filed prior to October 1, 2002, as the Court below finds that Plaintiff did not exhaust his administrative remedies as to these claims. *See* Section III(A)(1), *infra*.

4

March 2002.

**(3) March 2002 — Product Technical Specialist**
Plaintiff was denied a promotion to the position of Product Support Technical Specialist in March 2002.

**(4) March 2002 — Engineer/Scientist**
Plaintiff was denied a promotion to the position of Engineer/Scientist in March 2002.

**(5) May 2002 — Product Support Technical Specialist**
Plaintiff was denied a promotion to the position of Product Support Technical Specialist in May 2002.

**(6) September 2003 — Product Support Technical Specialist**
In September 2003, Plaintiff applied for and was not awarded the position of Product Support Technical Specialist. Greg Anderson ("Anderson") was the hiring manger for the position. Anderson was seeking an individual to fill this position who had experience managing EVMS functions and had experience developing Interactive Electronic Technical Manuals in the XML and SGML environments. Additionally, Anderson was seeking an individual with technical writing experience. Plaintiff's resume did not reflect that he had experience managing EVMS functions or that he had experience in technical writing. Anderson chose to hire Joe Rogish ("Rogish"), an individual with experience with EVMS reports and technical writing. Anderson, an African American male, was unaware of Plaintiff's race at the time the hiring decision was made.

**(7) March 2003 — Engineer/Scientist**
In March 2003, Plaintiff applied for and was not awarded the position of Engineer/Scientist. Thomas Nondorf ("Nondorf") was the hiring manger for the position. The position required an applicant to possess a professional engineering degree recognized by the Accreditation Board for Engineering & Technology. Plaintiff did not possess the requisite degree. Nondorf hired Diggle, who did possess such a degree. Nondorf was unaware of Plaintiff's race or protected activity at the time the hiring decision was made.

**(8) April 2003 — Product Support Technical Specialist**
In April 2003, Plaintiff applied for and was not awarded the position of Product Support Technical Specialist. Richard Bodzek ("Bodzek") was

the hiring manger for the position. Bodzek was seeking an individual with experience with tilt rotor systems. Plaintiff's resume did not reflect that he had experience with tilt rotor systems; all of Plaintiff's experience was with fixed wing aircrafts. Bodzek chose to hire David Jones ("Jones"), an individual with experience with tilt rotor systems. Bodzek was unaware of Plaintiff's race or protected activity at the time the hiring decision was made.

**(9) July 2003 — Engineer/Scientist**
In July 2003, Plaintiff applied for and was not awarded the position of Engineer/Scientist. Thomas Cummings ("Cummings") was the hiring manger for the position. Cummings was seeking an individual with a systems engineering background. Plaintiff's resume did not reflect that he had a systems engineering background. Cummings chose to hire Wendy Gilkerson ("Gilkerson"), an individual with experience in systems engineering. Cummings was unaware of Plaintiff's race or protected activity at the time the hiring decision was made.

**(10) April 2004 — Product Support Technical Specialist**
In April 2004, Plaintiff submitted his resume on-line for the position of Product Support Technical Specialist. The hiring manager, Black, never received Plaintiff's resume, as it was automatically screened out of the applicant pool by Boeing's BESS system, which identifies key words critical to a position, and eliminates from the applicant pool any resume that does not contain those key words. In this case, Plaintiff's resume was screened out of the applicant pool because it did not contain the word "Navy," which was identified as a key word critical to the position of Production Support Technical Specialist.

On July 28, 2003, Plaintiff filed an EEOC complaint, alleging discrimination, retaliation, and hostile work environment. On October 31, 2003, Plaintiff filed suit in this Court, alleging both Title VII claims and intentional infliction of emotional distress under Maryland state law. On January 7, 2005, Defendant filed its Motion to Dismiss. The instant motion is ripe for review and the Court will now issue an Opinion.

## II.     SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment will be granted

when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Haavistola v. Cmty. Fire Co. of Rising Sun, Inc.*, 6 F.3d 211, 214 (4th Cir. 1993); *Etefia v. East Baltimore Comm. Corp.,* 2 F.Supp.2d 751, 756 (D.Md. 1998). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1). The court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991) (internal citations omitted). While the evidence of the non-movant is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.,* 152 F.3d 326, 330-31 (4th Cir. 1998); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

## III.    ANALYSIS

### A.    Title VII Claims

#### 1.    Exhaustion

Plaintiff's charge of discrimination includes his claim that he was rejected for ten positions at Boeing for which he was qualified on the basis of his race. Defendant argues that Plaintiff's complaints concerning the positions to which Plaintiff applied prior to October 1, 2002 must be rejected as untimely by this court. The Court agrees.

Before a plaintiff has standing to file suit under Title VII, he must exhaust his administrative remedies

by filing a charge with the EEOC. *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000). The EEOC charge defines the scope of the plaintiff's right to institute a civil suit. *Id.* "An administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Chisholm v. United States Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981). In Maryland, a plaintiff must file his EEOC charge within 300 days of the occurrence of the discriminatory conduct or incident. *Sharafeldin v. Maryland, Dept. of Public Safety & Corr. Servs.*, 131 F.Supp.2d 730, 738 (D. Md. 2001).

In this case, Plaintiff filed his first EEOC complaint on July 28, 2003. Thus, any conduct that occurred prior to October 1, 2002 does not fall within the scope of Plaintiff's EEOC Complaint. Here, five of the ten incidents to which Plaintiff cites, where he applied and was not selected for a position with Boeing, occurred prior to October 1, 2002. Specifically, these incidents include the following positions: (1) October 2001 — Logistics Specialist; (2) February 2002 — Quality Specialist; (3) March 2002 — Product Technical Specialist; (4) March 2002 — Engineer/Scientist; and (5) May 2002 — Product Support Technical Specialist. Accordingly, the Court will not consider these incidents in conjunction with Plaintiff's charge of discrimination/retaliation.

### 2.     Discriminatory/Retaliatory Failure to Promote

In order to establish a *prima facie* case of failure to promote, Plaintiff must show that: (1) he is a member of a protected group; (2) he sought the position in question; (3) he was qualified; (4) he was rejected under circumstances giving rise to an inference of unlawful discrimination. *Jackson v. State of Maryland*, 171 F.Supp.2d 532, 544 (D. Md. 2001). Similarly, in order to establish a *prima facie* case

of retaliation, Plaintiff must show that: (1) he engaged in a protected activity; (2) his employer took an adverse employment action against him; and (3) a causal connection existed between the protected activity and the asserted adverse action. *Id.*

Under the *McDonnell Douglas* burden shifting scheme, if Plaintiff succeeds in establishing a *prima facie* case of either discrimination or retaliation, Defendant has the opportunity to present a legitimate, non-discriminatory reason for its employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Jackson*, 171 F.Supp.2d at 543. If Defendant does so, the presumption of unlawful discrimination created by the *prima facie* case "drops out of the picture" and the burden shifts back to Plaintiff to show that the given reason was just a pretext for discrimination. *Id.*

In this case, Defendant articulates a legitimate, non-discriminatory reason for failing to promote Plaintiff — that in each instance, Defendant chose to promote or hire a more qualified individual. Defendant further argues that Plaintiff does not rebut this legitimate, non-discriminatory reason with any evidence that Defendant's reason is merely a pretext for discrimination, and therefore the Court must grant summary judgment for Defendant. For the following reasons, the Court agrees.

After eliminating Plaintiff's failure to promote claims that occurred prior to October 1, 2002, the Court is left with five instances of alleged failure to promote. The Court will consider each instance in turn.

In September 2003, Plaintiff applied for and was not awarded the position of Product Support Technical Specialist. Anderson, the hiring manager for the position in question, was seeking an individual who possessed experience managing EVMS functions, had a thorough understanding of preparing and developing Interactive Electronic Technical Manuals, specifically in the XML and SGML environments, and had technical writing experience. Plaintiff's resume did not reflect that he had any experience managing

EVMS functions or any extensive experience with technical writing. In contrast, Rogish, the individual selected for the position, had experience dealing with EVMS reports and had developed rotary-wing aircraft technical manuals. Plaintiff presents no evidence that he was rejected for the Product Support Technical Specialist position, not because he was the lesser qualified candidate, but because of his race. Therefore, the Court will grant summary judgment in favor of Defendant.

In March 2003, Plaintiff applied for and was not awarded the position of Engineer/Scientist. The position in question required a qualified applicant to possess a professional engineering degree as recognized by the Accreditation Board for Engineering & Technology. Plaintiff did not possess a professional engineering degree as recognized by the Accreditation Board for Engineering & Technology. Diggle, the individual hired for the position, possessed the requisite engineering degree. Plaintiff has not presented any evidence that Defendant's legitimate, non-discriminatory reason is in fact a pretext for discrimination. As such, the Court will grant summary judgment in favor of Defendant.

In April 2003, Plaintiff applied for and was not awarded the position of Product Support Technical Specialist. Bodzek, the hiring manager, was seeking an individual with experience analyzing design issues on helicopters, as they have unique tilt rotor dynamic systems not found on fixed wing aircraft. Additionally, the position in question required experience in logistics support analysis and technical writing. Plaintiff's resume demonstrated that all of his relevant experience was in working on fixed wing aircrafts, versus tilt rotor aircrafts. Additionally, Plaintiff did not possess the required experience in logistics support analysis and technical writing. In contrast, Jones, the individual hired for the position, had experience working on the V-22 Osprey, which has a tilt rotor, and had experience performing logistic support analysis for that aircraft. Plaintiff cannot demonstrate that Defendant's legitimate, non-discriminatory reason for not hiring

Plaintiff was a pretext for discrimination. Therefore, the Court will grant summary judgment in favor of Defendant.

In July 2003, Plaintiff applied for and was not awarded the position of Engineer/Scientist. Cummings, the hiring manager, was seeking an individual with a systems engineering background with an emphasis in system development. Plaintiff's resume reflected no experience in computer simulations, computer analysis, or configuration management of systems. Gilkerson, the individual selected for the position, possessed the required configurations management and system engineering experience. Plaintiff cannot demonstrate that Defendant's legitimate, non-discriminatory reason for not hiring Plaintiff was a pretext for discrimination. Therefore, the Court will grant summary judgment in favor of Defendant.

In April 2004, Plaintiff applied for and was not awarded the position of Product Support Technical Specialist. Plaintiff submitted his resume on-line, and because Plaintiff's resume was screened out by the BESS system, it never reached Black, the hiring manager. Plaintiff's resume was screened out because it did not contain the term "Navy," which was critical to the position, the announcement of which explained "knowledge of IETMs and Tech Pubs as well as U.S. Navy maintenance environment required." The Court finds that Defendant has articulated a legitimate, non-discriminatory reason for not hiring Plaintiff, that is, his resume was excluded from consideration because it did not contain a term essential to the job. Plaintiff cannot demonstrate that Defendant's legitimate, non-discriminatory reason for not hiring Plaintiff was a pretext for discrimination. Therefore, the Court will grant summary judgment in favor of Defendant.

Plaintiff further alleges he was denied "team leader" status when Diggle left his position as a Tech Specialist in the Data Center. Defendant explains that Plaintiff was not granted team leader status because Milbrandt decided to eliminate all team leaders when Diggle departed, as he believed the designation to

be both unnecessary and ineffectual. Defendant has presented evidence that, at this time, the second shift team leader designation was also eliminated and, since that time, no one has been designated a team leader. The Court finds that Defendant has articulated a legitimate, non-discriminatory reason for not awarding Plaintiff "team leader" status. Moreover, Plaintiff cannot demonstrate that Defendant's legitimate, non-discriminatory reason was a pretext for discrimination. Therefore, the Court will grant summary judgment in favor of Defendant.

### 3. <u>Hostile Work Environment</u>

Plaintiff's Complaint also alleges that, during the course of his employment with Defendant, Plaintiff was subjected to a hostile work environment. Defendant argues that Plaintiff has failed to establish a *prima facie* case of hostile work environment. The Court agrees.

In order to prevail on a claim of hostile work environment, Plaintiff must prove that the offending conduct was: (1) unwelcome; (2) based upon his race; (3) sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment; and (4) imputable to his employer. *See Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998).

Here, in support of his hostile work environment claim, Plaintiff relies largely upon the August 2001 incident, during which Dickson, upon learning that Plaintiff would be working with him, told Plaintiff to call him "Massah Dave." Plaintiff also cites to the hostile actions of his fellow co-workers, including Diggle, Black, and Smith. Defendant argues that these incidents fall short of constituting a hostile work environment. The Court agrees.

In the first instance, the Court finds that the August 2001 incident is outside the scope of Plaintiff's July 28, 2003 EEOC charge, and thus cannot be considered in conjunction with Plaintiff's hostile work

environment allegation. As noted previously, a plaintiff must file his EEOC charge within 300 days of the occurrence of the discriminatory conduct or incident. *Sharafeldin*, 131 F.Supp.2d at 738. In this case, Plaintiff filed his first EEOC complaint on July 28, 2003. Thus, any conduct that occurred prior to October 1, 2002, including the August 2001 incident at issue, falls outside the scope of Plaintiff's EEOC complaint and cannot be considered.

Second, the Court finds that Plaintiff cannot show that he was exposed to conduct sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment. Whether an environment is hostile or abusive can be determined only by looking at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). The standard for proving a hostile work environment is intended to be a high one. *Purnell v. Maryland*, 330 F.Supp.2d 551, 560 (D. Md. 2004). The conduct must be extreme; "isolated or sporadic comments generally will not suffice." *Id.* (internal citations omitted).

In this case, Plaintiff's non-specific allegations of sporadic hostility do not rise to the level of abuse required to demonstrate a hostile work environment. Even if the Court were to consider the August 2001 comment by Dickson — which, if proven, could be considered nothing other than an ugly racial slur — this single incident, for which Dickson was later made to apologize, would not constitute a hostile work environment. *See Carson v. Giant Food, Inc.*, 187 F.Supp.2d 462 (D. Md. 2002). Moreover, the Court does not find that the well-intentioned career advice of Black, who advised Plaintiff to seek greater opportunities at larger Boeing facilities, was in any way offensive or hostile. Nor does the Court believe

that any of the other discriminatory acts alleged by Plaintiff, including generalized hostility, amount to conduct sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive work environment. *See Dachman v. Shalala*, 46 F.Supp.2d 419, 438 (D. Md. 1999) (Title VII not meant to insulate employees from normal day-to-day dissatisfactions and annoyances commonly arising in any workplace or from generalized unpleasantries).

Third, the Court finds that Defendant is not liable for the behavior of its employees as described by Plaintiff. Defendant is only liable for the behavior of its employees if it was negligent in failing, after actual or constructive knowledge, to take prompt and adequate action to stop the harassment. *Mikels v. City of Durham*, 183 F.3d 323, 332 (4th Cir. 1999); *see Spicer v. Commonwealth of Virginia, Dept. of Corr.*, 66 F.3d 705, 710 (4th Cir. 1995). The remedial response taken by Defendant need not be the most effective that could have been devised, and courts should give great weight to whether a particular response was demonstrably adequate to cause cessation of the conduct in question. *Mikels*, 183 F.3d at 330. Considering the August 2001 incident, management was made aware of Dickson's conduct and immediately took steps to sanction Dickson for his behavior. Indeed, upon prompting by higher-ups in the company, Dickson voluntarily signed a written note of apology to Plaintiff, as Plaintiff had requested. It is undisputed that, after the remedial actions taken by Defendant, Dickson made no subsequent offensive comments. The Court therefore finds that, as Defendant acted both promptly and effectively to end the conduct, Defendant is not liable for Dickson's comments. For all of the above-stated reasons, the Court will grant summary judgment in favor of Defendant concerning Plaintiff's claim that he was subjected to a hostile work environment.

  **B.**  **Intentional Infliction of Emotional Distress**

Defendant argues that Plaintiff fails to demonstrate a *prima facie* case of intentional infliction of emotional distress, and therefore the Court should grant summary judgment as to Plaintiff's state law claim. The Court agrees.

In Maryland, in order to establish a claim of intentional infliction of emotional distress, a plaintiff must show that (1) the conduct was intentional or reckless, (2) the conduct was extreme and outrageous, (3) there was a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress was severe. *Ford v. Douglas*, 799 A.2d 448, 451 (Md. Ct. Spec. App. 2002) (citing *Harris v. Jones*, 380 A.2d 611, 614-15 (Md. 1977)). Conduct is deemed outrageous and extreme "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* The Maryland Court of Appeals has explained: "In developing the tort of intentional infliction of emotional distress, whatever the relationship between the parties, recovery will be meted out sparingly, its balm reserved for those wounds that are truly severe and incapable of healing themselves." *Figueiredo-Torres v. Nickel*, 584 A.2d 69, 75 (Md. 1991).

The Court finds that Plaintiff's allegations do not rise to the level of outrageousness necessary to constitute intentional infliction of emotional distress. Considering the August 2001 incident, Plaintiff was not physically harmed, nor was the conduct complained of inflicted by a supervisor. *See Bryant v. Better Bus. Bureau of Greater Maryland, Inc.*, 923 F.Supp. 720, 748 (D. Md. 1996) (Abuse of position of authority increases likelihood that conduct in question was sufficiently outrageous). Nor does the Court believe that Plaintiff's generalized allegations of harassment are sufficient to demonstrate the state law tort.

Additionally, Plaintiff has failed to establish that he has suffered the severe emotional response

required for recovery. The Maryland Court of Appeals has explained that the tort of intentional infliction of emotional distress "requires the plaintiff to show that he suffered a *severely* disabling emotional response to the defendant's conduct." *Harris v. Jones*, 380 A.2d 611, 616 (Md. 1977) (emphasis in original). The Court of Appeals explained the requisite emotional state in detail, as follows:

> Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises. Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. *The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it*.

*Id.* (emphasis in original).

In this case, Plaintiff argues that, as a result of harassment by his co-workers and supervisors, he "continues to be emotional when he contemplates the circumstances of his employment and denial of advancement," "was unable to sleep and eat, became depressed and experienced other disruptions of his life," "felt forced to seek medical treatment." Plainly, these hardships do not manifest distress so severe that no reasonable man could be expected to endure it. Thus, the Court will grant Defendant summary judgment as to Plaintiff's claim of intentional infliction of emotional distress.

### C.     **Motion to Strike**

Defendant asks this Court to strike Plaintiff's response to Defendant's reply memorandum concerning Defendant's Motion for Summary Judgment. The Court notes that Plaintiff's response brief, though not so named, is effectively a surreply. Under the local rules, "[u]nless otherwise ordered by the Court, surreply memoranda are not permitted to be filed." *See* Local Rule 105.2 (a) (D. Md. 2004).

Here, the Court did not grant Plaintiff leave to file a surreply, nor does the Court see any need to consider Plaintiff's surreply memorandum. As such, the Court will grant Defendant's Motion to Strike.

### D.      Motion for Court Ordered Mediation

Plaintiff asks this Court to order mediation for the parties in this case. Plaintiff provides no reason as to why Defendant should be forced to engage in mediation and there is no indication that any prior agreement of the parties requires the imposition of mediation. Moreover, the above determination of Defendant's Motion for Summary Judgment resolves all of the outstanding issues in this case. Accordingly, the Court will deny Plaintiff's motion.

### E.      Motion to Amend/Correct Complaint

On April 15, 2005, Plaintiff filed a Motion to Amend/Correct Complaint, in which he asks this Court for leave to amend his Complaint. The Court finds that Plaintiff's request is untimely and will deny the motion.

Plaintiff filed his Complaint on October 31, 2003. On March 17, 2004, Defendant filed its Answer to Plaintiff's Complaint. Defendant filed its Motion for Summary Judgment on January 7, 2005, after the conclusion of discovery. Rule 15 of the Federal Rules of Civil Procedure explains that "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served ... Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed. R. Civ. Pro. 14(a). The following factors guide a court's determination of whether a motion to amend should be granted: (1) undue delay; (2) bad faith; (3) futility of amendment; and (4) prejudice to the opposing party. *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999). Delay alone is insufficient; it must be accompanied by

prejudice, bad faith, or futility. *Id.*

Here, delay is evident. Plaintiff states that he learned additional information during the course of discovery that prompted him to file his request to amend his Complaint. However, Plaintiff provides no reason as to why he did not promptly amend his Complaint when this information was discovered instead of waiting until after Defendant filed its dispositive motion and, indeed, for more than three months thereafter. The Court additionally finds that Defendant would be prejudiced if Plaintiff were allowed to amend his Complaint. Defendant would be forced to reconsider and perhaps rewrite its Motion for Summary Judgment. Moreover, Plaintiff would have the benefit of amending his Complaint in light of Defendant's litigation strategy, as revealed in its Motion for Summary Judgment. For these reasons, the Court will deny Plaintiff's Motion to Amend/Correct Complaint.

## IV.     CONCLUSION

For all of the aforementioned reasons, the Court will GRANT Defendant's Motion for Summary Judgment [40], GRANT Defendant's Motion to Strike [53], DENY Plaintiff's Motion for Court Ordered Mediation [55], and DENY Plaintiff's Motion to Amend/Correct Complaint [56]. An Order consistent with this Opinion will follow.

Date:   June 22, 2005                                                             /s/
                                                                                                Alexander Williams, Jr.
                                                                                                United States District Court